Robert Carlisle v. Board of Trustees et al. Mr. Schwartz, whenever you're ready. Good morning, Your Honor, and may it please the Court, I would request five minutes for rebuttal, please. Yes. So there are three main reasons why this Court should reverse and hold that the complaint plausibly alleges that defendants breached their fiduciary duties by investing over 50 percent of plan assets in the three highest risk asset classes, private equity, emerging market equities, and alternatives, and thereby limiting the domestic equity allocation to a minuscule 18 percent. First reason, the Ninth Circuit in the California Ironworkers case upheld a trial judgment, not a motion to dismiss denial, but a trial judgment, that allocating 30 percent of a pension plan's assets in highly risky investments, it was inverse floaters there. Well, I can tell very well that they did that in a different case. But, frankly, I'm not terribly interested in what they did. I want to know why this was done was wrong at the time they did it rather than just hindsight. So it was wrong why they did it at the time because when you invest 50 percent of your assets in the highest risk asset categories and thereby limit domestic equities, which is the gold standard for investing, to a minuscule 18 percent when every other Taft-Hartley plan had nothing like that allocation and they're big outliers, when they were warned that these asset classes were volatile. You say every other. What you showed was an average of whatever people did. I'm not sure you showed particular ones, all of them being different, did you? We did not say here's 25 different Taft-Hartley plans. However, Makita, in its role as investment advisor to the plan, said that the peer universe was your Taft-Hartley peers. And what Makita said and what Horizon also said was the reason why the results were so bad was because you over-weighted in private equity and alternatives and under-weighted in emerging market equities and under-weighted in domestic equities. That's why you did worse than your peers. And the way the defendants argue that pleading the peer universe is not sufficient. And so how do you respond to that? Okay. I respond to that in the case. In other words, you didn't do any specific identifying. You relied on the average of peers. So in most cases, what happens, and I've been guilty of this, too, plaintiffs' lawyers will say here's a bunch of plans, we think they're similar, that's the right peer universe. In this particular case, it was Makita that said this is the relevant peer universe, this is the relevant peer group, this is how we analyze what you're doing compared to what is a benchmark. Now, you've got to have a benchmark. There's no other benchmark that appears in the record. There's no other benchmark that any defendant points to. Makita in its reports says this is the relevant benchmark. And if there's no benchmark at all, that's an independent breach of fiduciary duty. But they had the benchmark. But you're arguing that the mere conclusion that this is the relevant peer group is sufficient? I mean, was there any more detail provided in the complaint? In terms of benchmarking, there was more detail. But it is Makita that used the peer, its peer universe for Taft-Hartley plans as the relevant peer group. I would also ---- What worries me is that if you, if we decide for you, I mean, obviously they did a terrible job here, but if we decide for you, aren't we saying to investment advisors and so on that you must not take chances, that you must go with what everybody else does? And what everybody else does may be right, but it may also be disastrous. There are any number of times when instead what everybody else does doesn't meet inflation or collapses when there's one of these usual crises while the person who does it differently survives. And, you know, aren't we sympathetic? But if we rule for you, aren't we really getting into a situation where we're saying that everybody must be the same and if, or within a very narrow range, and then if that is terrible, huh, duh? Where I would disagree with you, Your Honor, is talking about a narrow range. Of course, there is a range within trustees to make reasonable choices. Some trustees may want to dial up the risk a little bit more. If they're doing it in an informed way, some may want to do it a little bit less. I think the best way to look at this is in the St. Vincent case, this Court said 4.2 percent in these risky mortgage-backed securities, 4.2 percent didn't seem enough in that case to get past the plausibility standard. But St. Vincent cited the iron workers case with approval. And in iron workers, they did two things. For the plan that had just 5 to 7 percent invested in the highly risky inverse floaters, the court at trial said that's not enough for me to say there was a breach of fiduciary duty. But for the other plan, which had 30 percent, that much, that many eggs in that basket of highly risky inverse floaters, it said it's too much and it held liability for them. And so is there a range within trustees to make choices and decide how risk, you know, inverse or risky they want to go? Sure. But 50 percent in the highest risk asset categories, I think that's a minimum that's plausible. And what we saw in Judge Caproni's decision in the musicians case was she held a similar asset allocation where Mojito was also involved. That satisfied the plausibility standard. And what we found out when I litigated that case very up to the courthouse steps at trial, there was a boatload of evidence and discovery that really demonstrated that we were right on the mark. And that's why we got such a good settlement in that case. So I take your point that trustees can make different decisions and there is a range and you have to give them flexibility. But 50 percent in the highest risk and only 18 percent in domestic equities, that's not the case. But is the suggestion, though, that that could never be appropriate, that 50 percent in the high risk? I mean, are you advocating for a bright-line rule? And if you're not, which, well, I'm assuming, but maybe not. Maybe you are arguing for a bright-line rule. But if you're not arguing for that, how do we, without more information, why are the numbers, why is that number enough to kind of say, well, this is? Sure. At trial, a court fact finder may hold 50 percent as a bright-line rule is too much. But here, I'm only saying that it raises the plausible claim. There's no rule 12 here. Second, in addition to the asset allocation, we have a process. And usually plaintiffs don't have information about the process and complaints in these cases. But the process here was infected by Nikita's conflict of interest, which was so bad that it was so bad.  Talk to us about that, because that would make a difference. What was this conflict of interest? I mean, she was getting a large fee, Nikita, but it was a fixed fee, and there was no suggestion that I saw on the record that this was linked to this kind of assets. So the fact that it's a flat fee is irrelevant because Nikita can only get the extra million dollars a year if, in its role as investment advisor, it says we've got to take these big risks and we've got to invest in these big risk asset classes. Why? Why could she only get the extra if they invested in risky investments? Can you spell that out for me? Yes, I can. Because the only way there's a need for Nikita to make a million dollars a year as private investments manager is if there's a very large private investments allocation. And so Nikita, in its hat, and this is exactly what the DOL was saying in that lawsuit abroad against the other plan where Nikita got the same dual role. In its hat, as investment advisor, if it says this is too risky, you don't want to invest this much in private investments, there's no need for Nikita to then become private investments manager. But aren't there private investments which are not risky? I mean, couldn't she get exactly the same thing doing something which you would say is the type of investment that the peer group, as you've suggested, would do? Well, since Nikita's reports say and label private equity as the highest risk, most volatile, you know, most illiquid asset category, I think the answer at the complaint is no, because that's how Nikita characterized it. Nikita didn't say that private equity and the private equity that you'll be putting it into as manager would be some kind of oddball private equity that doesn't have the same risk attributes as private equity in general. So that's what Nikita called it. And, again, at the pleading stage, if that's how Nikita labels it, I don't see how defendants can get the inference that maybe there's something special about this private equity investment bundle that they did compared to other private equity investments. Thank you. Okay. I see my time is up, so unless you have more questions, I'll wait. You have five minutes for rebuttal. Yes. Okay. Thank you. Good morning. May it please the Court. My name is Michael Kennealy, and I am counsel for the Fund's Board of Trustees. The district court correctly determined that plaintiff's allegations don't state a plausible claim for relief. ERISA permits plan fiduciaries to follow. So on that very point, why isn't the allegation that 50 percent was in the highest risk, why isn't that at least a plausible claim of imprudence? Well, for several reasons, Your Honor. The first reason is that that 50 percent statistic is actually lumping together five different categories of very different things, each of which is themselves comprised of very different things. So private equities is not just like a single thing you go ask your investment advisor to provide you. There are lots of different private equities. The allegation is that 50 percent was in the highest risk category. Is that not alleged? Is that not true? I mean, why doesn't that make out a plausible claim? Because even if that is true, it actually glosses over a lot of variation within that 50 percent. So you have private equities, you have emerging markets equities, you have infrastructure. Those are very different things. But the bigger question I think is a question you asked Judge Chin of my adversary, which is where do you get the allegations needed to have a benchmark to know that that 50 percent is outside of the reasonable range of judgments that a fiduciary could make in the particular circumstances of this fund? And that's what's missing in the complaint. Why isn't the allegation about the peer group sufficient on a 12B6 motion? You can obviously attack it, but we're at the 12B6 stage. The Ninth Circuit dealt with that exact question in Anderson v. Intel. There the plaintiff also relied on allegations that peers were doing something very different from the defendant's plan. And the Ninth Circuit said, well, you're just using peer as a conclusory label to show that the benchmark you're drawing is a meaningful one for this plan. But what's the proof? The argument is that the use of the peer group here was Makeda's term. Well, what Makeda said was that your peers are doing allocations slightly differently. Well, I asked the other side whether this wouldn't be telling everybody to do the same. I'd like to ask you, what would be sufficient to get by 12B6? Would you need some evidence of individual wrongdoing in investment situations? Or is there enough to say that these people were so far out of line in some sense, and we are saying, and we'll show you later what that means, that is enough to get by 12B6? So is there anything, you know, I'm asking you to have you in a way against yourself, but to say, what is it that is enough? So the core of the duty of prudence is a process-based duty. And the court said, this court said in the St. Vincent Catholic Medical Center case, that you can either allege directly what about the process was screwed up, and that would be a direct allegation of an imprudent process, or you can rely on circumstantial facts that you allege that raise an inference of imprudence. And if you're going to go that second route, which is what I take plaintiffs to be doing here, you need to show that a reasonable fiduciary in your circumstances would have done something different. And that's the piece that's missing here, because these were very challenging circumstances dating back well before the class period for reasons that don't have anything to do with my client's investment decisions, but have to do with changes in the population of the retirement fund and a decrease in the number of active participants for which you are. You are saying this fund was in trouble before for some reasons. And at this point, these people chose to do something which turned out to be wrong and was dangerous, but which a reasonable person, a reasonable trustee might do to try to get out of trouble. A reasonable trustee could do. And, in fact, what the trustees tried to do here was accomplish an 8.5 percent investment return. That's what plaintiffs allege. What they don't allege is actually we did a bad job at that, that we came below 8.5 percent. They say we could have done better had we invested in domestic equities, which are often thought of as being a very risky category in their own right. But in any event, we – Would part of that be also that in these ERISA plans, if you end up screwing up rather than doing better for your people, the government will step in, which doesn't mean they won't be harmed. That's a standing issue, and I'm not with you on that one. But the downside risk to the people you're supposed to be looking after is limited because the government is there to back you up. It is limited, Your Honor. And, of course, here we had the special financial assistance from the American Rescue Plan, which restored all of plaintiffs' benefits. Yeah, but what I'm saying is not that – I'm not interested in that it restored them because I don't think it really did, and it's a collateral issue, but that in making a riskier investment to get out of trouble, a reasonable investment person might say, hey, and by the way, if taking a risk turns out to be wrong, it's not that bad because we've got the government stepping in. Well, I think a reasonable investment person here is really trying – the Board of Trustees really is trying to protect the participants in the plan, and they wouldn't – I don't think they would gamble any of the plan's assets in order to attempt to get out of a hole. I think they were trying to deal with the hand they were dealt as best they could, and there aren't any allegations that they fell short of the 8.5% investment return that they set for themselves. In fact, the record materials that we submitted in our motion to dismiss show that they, in fact, achieved the 8.5% investment return. So they didn't do the bad job that plaintiffs are suggesting. They actually did what they set out to do, and that was a strategy that long predated the class period and that they stuck to consistently over the course of many years. This isn't the type of case where they were flailing and jumping around from one attempt to fix the problem to another. They had a deliberate strategy, and that is exactly the sort of prudent process that ERISA wants fiduciaries to have. Thank you. Thank you, Your Honors. Good morning, Your Honors, and may it please the Court. Sam Rudman from Chode Hall and Stewart on behalf of Makita Investment Group. I'd like to pick up the question of what would be sufficient to state a claim for a breach of the duty of prudence in this context, and what is it that the complaint has, and why does it fall short? As counsel for the trustees said, you can state a claim for the breach of duty of prudence in the investment context in either of two ways. First, by directly attacking the process. Now, some cases say that plaintiffs will not have access to much information about the process. That's clearly not true here. As you can tell from the complaint, the plaintiffs had access to years of Makita's reports, and the complaint itself describes Makita's process in some detail. It had three steps. First, Makita projected the returns associated with each of the asset classes in which the fund invested. The plaintiffs do not identify any imprudence in those projections. On the contrary, Your Honor, the Horizon Capital Markets survey that plaintiffs cite shows that other investment advisors had very similar projections. No imprudence in step one. Second, Makita identified the risks associated with each of the asset classes in which the fund invested, and it disclosed those risks to the trustees. The plaintiffs, again, do not allege that Makita misapprehended or underestimated those risks. And in light of Makita's projections, which accorded with the projections of other advisors, and in light of Makita's assessment of the risks with which plaintiff does not quarrel, the allegation is that Makita's advice was based, at least in part, on its self-interest, its ability to earn more. I'm happy to address the duty of loyalty point, Your Honor. I want to address that head-on. First, that claim is time-barred. The pleadings before the district court, the district court concluded that wasn't clear. It is clear on appeal. Plaintiffs have now admitted that Makita was in place as both the investment consultant and the discretionary. I wasn't asking the question simply about the duty of loyalty. I mean, does it not factor in on the duty of prudence as well, arguably, that its advice was tainted? Is that not part of the process? No, Your Honor, it doesn't. And it goes back to what Judge Calabresi said earlier. It is undisputed that Makita's arrangement called for Makita to receive a flat fee. Yes, but if it is the case that that flat fee, even if arranged before, could only be justified later by doing some things which were unduly risky, that would be a statement about the process and the fact that a deal was made to make it so that there isn't a claim of disloyalty as of that time because that's too early, but that that is evidence of an improper choice of investments. And here's the problem with that argument for plaintiffs, Your Honor. In order to get that argument off the ground, they would have to say that the fund should have had no private markets allocation so that there would be no private markets manager. That is, that the fund would not have had a private markets manager but for this advice. The plaintiffs do not make that allegation, Your Honor, and here's why. Even what they point to as the benchmark, which I'll address in a minute, which is not a benchmark, but even according to their benchmark, which appears in paragraph 67 of their complaint, the U.S. Peer Group has an allocation to private equity. So they cannot allege, and this complaint does not allege, that but for the conflict, the alleged conflict, there would have been a 0 percent allocation to private equity. That's the problem with that argument. Between 0 and 50. So. That's the argument. I don't. Just because others have some, did any of the others have 50 percent? I think this gets back to the duty of prudence, if I'm understanding correctly, Your Honor. Yeah. And we address this on page 16 of our brief. There is no, quote, course of investment action that is imprudent because of risk alone, that is per se imprudent of risk alone. There is not. If you can't identify a problem with the process, then this Court has been clear that you need a benchmark. And in seeing the Court called for concrete examples of real comparators, that is, fiduciaries giving advice in similar situations to funds in a similar financial position with similar financial goals. And for all the reasons described in Barchok and Anderson, you simply cannot derive that inference from an undifferentiated average of other U.S. Taft-Hartley funds. There's one point that I want to make sure I address in my remaining time. And that is that plaintiffs say today that Makita called the Taft-Hartley universe the benchmark. I want to be clear that that's not in the complaint. What Makita was doing in the complaint when it compared the fund's performance to the Taft-Hartley universe was an attribution analysis. It was explaining why performance was different. It did not say, and it never said, and the complaint does not say, that you ought to have the same asset allocation as these other funds. And if you'll indulge an analogy, you could imagine that a steakhouse might compare its performance to a large group of other restaurants. And it might observe that if beef costs were high at a particular time, it performed somewhat worse than the groups to which it compared itself. Nothing about that comparison would suggest the steakhouse has the same aims or goals or is in the same position as the other restaurants or ought to conduct itself in precisely the right way. And frankly, if this Court were to hold that merely comparing performance, doing an attribution analysis between one fund's asset allocation and a very broad peer group was enough to plead that that peer group was a benchmark, I'd suggest it would be very difficult for investment advisors to do their job because for all sorts of sound reasons, they may want to draw those comparisons to explain differential performance. And that's simply not the same thing as saying it's a benchmark. And just to be clear about this, Makita is not shy about saying what a benchmark is. On page 524 of the joint appendix, which reports the historical performance of the fund at the end of the class period, the first thing under the fund's performance is a custom benchmark with a footnote that explains exactly the type of performance, that is the classes of investment, that the benchmark was intended to track. It also shows on that same page that over 10 years, from 2011 to 2021, the fund achieved an 8.5 percent return, which is what Makita projected throughout the class period. Thank you very much, Your Honor. Good morning. May it please the Court. Sam Levin from Groom Law Group on behalf of Defendant Appellee Horizon Actuarial Services. This Court should affirm the District Court's well-reasoned conclusion that the complaint failed to allege that Horizon functioned as an ERISA fiduciary. Plaintiff offers two legal theories as to why he believes Horizon was an ERISA fiduciary, but both are squarely foreclosed by his own allegations. The first legal theory is that Horizon was a fiduciary by virtue of exercising control respecting the management of plan assets. That requires Horizon to have exercised actual decision-making power over how to invest plan assets, not merely to have had influence over decisions made by the trustees. That's the Pappas v. Buck decision from the Seventh Circuit that was cited by both parties, and the same actual decision-making power test has been applied unanimously by other circuits, including the Fifth Circuit's Reich decision, which this Court favorably quoted in Allen v. Credit Suisse. Horizon is not alleged to have had any actual decision-making authority. Rather, actual decision-making authority is alleged to have been exercised by the trustees and Makeda. Nor is Horizon plausibly alleged to have exercised any undue influence over the trustees or Makeda. To the contrary, Plaintiff's theory on appeal is exactly the opposite, that the trustees and Makeda pressured Horizon. Finally, in his reply, Plaintiff asserts that the relevant inquiry is whether Horizon played a role in the decision-making process, without which the trustees and Makeda may not have decided to pursue the investment strategy. But that is not the applicable legal test. To the contrary, the Fifth Circuit held in Reich that having an influential role in planned decisions does not make someone a fiduciary. Similarly, the Seventh Circuit in Hecker v. Deere said that playing a role is not enough to transform a company into a fiduciary where it did not have, quote, final authority, close quote, over the decision. That's at 556 F. 3rd at page 784. What about the allegation that Horizon's actuarial advice was really investment advice? So there's no allegation in the complaint that Horizon did anything other than select this investment return assumption, which is something that actuaries for defined benefit plans are required to do. And Plaintiff concedes that, at least as a general matter, that is an actuarial function. Would you go further and say that if an actuary in a situation has been asked by the people, hey, what do you think of this, and they say, as you or I might, hey, that's a pretty good investment or bad, that still wouldn't be enough to make them a trustee under mere reserve requirements? That's correct, Your Honor. It still does not give them any control because the control remains with them. Your bulk argument is, you know, this is an accountant, and the accountant maybe asked some things, but however wrong they were, that ain't my responsibility. Correct. And in particular, with respect to the investment advice fiduciary tests, there are cases that say just because an advisor weighs in and offers an opinion on something, that does not make them a fiduciary. And if it were, I think the result would be that that would chill speech of the advisors, and you would be in a position at board meetings where perhaps an investment advisor is suggesting some course, and whether it's the fund's counsel, the fund's actuaries, the fund's accountants, perhaps feel like they couldn't weigh in and make any comment without being transformed into a fiduciary. But there is not even an allegation here that Horizon made any statements or did anything that could possibly look like investment advice, other than providing this actuarial return assumption, which they were required to do, and the theory that Plaintiff seems to be advancing as to how that somehow transformed Horizon into a fiduciary is because Horizon did it, you know, not in accordance with actuarial standards, or perhaps they did it fraudulently, although that's, you know, a theory they're advancing on appeal that wasn't alleged in the complaint. But this Court and other courts have been clear, and this is from this Court's decision in Allen v. Credit Suisse, that wrongdoing in performing non-fiduciary services does not transform the alleged wrongdoer into a fiduciary. And Plaintiff does not cite any analogous cases in the history of ERISA in support of his position. There's never been an actuary held to be a fiduciary, and the one case that he cites in his briefing on appeal involved a situation where a law firm was held to be a fiduciary that had a number of unique facts that are not alleged here, including that one of the law firm's partners was a trustee of the fund, so clearly a fiduciary. Moreover, with respect to the Plaintiff's second theory, the investment advice fiduciary theory, we've already talked a little bit about why there was no investment advice here, but even if Plaintiff could somehow construe anything that Horizon did as providing investment advice, that's only the first prong of the five-part investment advice fiduciary test. And there's nothing in the complaint that suggests that any of the other four elements are met, which is that it's provided on a regular basis, that it's provided pursuant to a mutual agreement or arrangement or understanding that the advice would serve as the primary basis for the plan's investment decisions and that the advice was rendered for a fee. And not only is there no allegation that there was an agreement between Horizon and the trustees that they would be providing the primary basis for investment advice, Makeda was clearly under contract and being paid specifically to provide investment advice, and as the court in Apogee noted, it's not plausible that another advisor who was not retained to provide investment advice would have magically just had some sort of understanding with the fund that they would be providing investment advice for a fee when another advisor had been retained to do that. And two quick final points. Even if somehow Horizon was determined to be a fiduciary, as was mentioned earlier, the plaintiff never alleges that the 8.5% investment return assumption was wrong, so there's no basis to hold them liable for a fiduciary breach when they did not get the decision wrong. Thank you. Thank you. So my friend, Mr. Rudman, said that you have to either show a defect in the process or a defect or show a benchmark. We have both. For the process, I think one of the key facts here which shows why Makeda was so conflicted was for the musician's pension plan where the trustees and Kroskauer told the trustees, don't let Makeda have this dual role, in 2016, Makeda said to the plan trustees and musicians, de-risk, get rid of your EMEs, we're getting rid of EMEs on all of our plans and for our own accounts, but they gave the exact same opposite advice to the trustees' plan here. Why? Because they had a financial interest to keep the high-risk asset allocation here. So from a process point of view, that's a good example that you almost never have in a motion to dismiss of an actual different piece of advice out of the same mouth, out of the same defendant. I think that that is dispositive here. From the process point of view also, Makeda is not the only private equity manager in the world. If they wanted to have some small, reasonable private equity stake, they could have had lots of other people. To have the same person in both roles makes no sense. But is that really, I mean, whether or not it's wise to have the same person, the same organization in that role, I mean, there's, can you point to something that suggests that is, to you that is a bad process, the fact that you've hired a particular person who has what you are describing as a conflict, and I'm not sure if it is, that still doesn't sound like a, I don't see exactly how that's a process flaw, that this is a bad process. So garbage in, garbage out. If you have a conflicted advisor in the most important role, then there's the risk you're going to get garbage in that's infected by the conflict of interest. If the Department of Labor sues trustees for doing the same thing and says this is a conflict of interest, if Proskauer, who represents the Musician's Pension Plan, tells its trustees when Makeda makes the same pitch, this is crazy, you can't do it, and we have the two pieces of advice on EMEs completely different between the Musician's Plan where there's no conflict and no financial incentive and the Teamsters, that out of motion to dismiss stage sure smacks up a lot of process. And you layer on that — And I'm — that somebody has these two things, even though that's not forbidden, it's not — I'm puzzled. And that's a good question, and my answer here is a fundamental mistake of the district court was that it violated the Supreme Court in Hughes, this case in St. Vincent. You look at the complaints allegations as a whole, and here we have the crazy asset allocation. We have the defects in the process. You have to put all those things together, and so we have multiple layers of conflict. We have Horizon with two sets of books, two different actuarial assumptions. You have Horizon doing what Milliman and the Musician's Plan refused to do, which is distorting their actuarial assumptions so they could close that gap so you could sneak things through. So I think the key issue in this case, as Your Honors, evaluate all the evidence that we have for the plausibility standard is considered as a whole, and given all the pieces of factual detailed allegations we have as a whole, I think that more than — more than puts us well over the plausibility standard. We did not have most of this stuff in the Musician's motion to dismiss where Judge Caprone got us over the plausibility standard. And the evidence in that case clearly showed that that was a wise decision that she made. Next point on this asset allocation benchmark. Besides, Makita called it the peer universe, the peer group. And if you take a look at the joint appendix at pages 549, 560, 1147, 419, they use the same kinds of words to describe the benchmarks for individual investments. So for EMEs, they cite the MSCI index as the benchmark for that specific investment. For domestic equity, they cite Russell 3000 for the benchmark for those specific investments. So they're using the same language, peer universe, peer group, for the asset allocation and the Taft-Hartley plans as they do for individual benchmarking for individual specific asset classes and individual investments. So, again, they can argue that —  Are you suggesting that the peer universe — referring to a peer universe is the same as referring to a benchmark? We know that your friend on the other side suggested that they did not describe the actions, the rates of the peer universe as the benchmark or a benchmark. See, them quibbling over their language to me seems like a trial issue, not a motion-to-dismiss issue. I would also point out that the outlier of the asset allocation is also buttressed by statements by Wilshire, Gallagher, and SCI, which we pointed out in our brief. And, in fact, when Gallagher and SCI looked at the asset allocation, excessive one to private equity and emerging market equities for the musician's plan, they both said, that's crazy, that's way out of the box, that's way too aggressive. So, again, multiple layers. It's not just what I'm citing to Makeda for the benchmark. Gallagher, SCI, Wilshire are saying the same exact thing. And Horizon's survey, which my friends here have all the excuses why it doesn't really mean what it says, but that survey also shows that they are way out of the box of their peers. Thank you. Thank you very much. Thank you very much. Thank you to all of you. Very well argued by all sides. We will take this case under advisement.